**TOTAL SAFETY SERVICES, INC.**
**218 MAGNOLIA STREET**
**LONG BEACH, MISSISSIPPI 39560**

**ACCIDENT INVESTIGATION – SAFETY CONSULTING - LITIGATION SUPPORT**

# JEREMY A. PARKER
# VS.
# JOHN W. STONE OIL DISTRIBUTORS, LLC

**DATE**
**May 19, 2019**

**CIVIL ACTION:**
**NO. 18- 3666**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**JUDGE ELDON E. FALCON**
**MAGISTRATE JUDGE JOSEPH WILKINSON, JR.**

**Prepared for**

**MR. WILLIAM WYNNE**
**JONES WALKER, LLP**
**201 ST. CHARLES AVE, SUITE 5100**
**NEW ORLEANS, LA 70170**

**TELEPHONE NO.:(504) 415-0945**
**111TOTAL@GMAIL.COM**

EXHIBIT A

# INTRODUCTION

This preliminary ROOT CAUSE ANALYSIS report investigates the accident that occurred aboard the ***M/V PRESAGER***, a Towing Vessel, owned by John W. Stone, Inc., on or about March 9, 2018, at or about 0040 hrs., and outlines the findings from that investigation.

# QUALIFICATIONS

**QUALIFICATIONS:** I have over 50 years of experience in the safety field relating to the exploration, production, and transport of oil and gas and the marine industry. These fields included such industries as production platforms, barges (pipe laying, dredging, drilling, jack ups, lift-boats, spud, supply, deck, oil, tank, etc.), structural, fabrication yards, and vessels / boats (ship, MODU, tug, tow, supply, crew, etc.). This experience was derived from being the manager/supervisor of the Safety Department for Amerada Hess Corp. (Lafayette region), J. Ray McDermott, Inc. (Marine and Diving Divisions, Harvey Group), McDermott International, Inc. (Singapore, South East Asia Group) and the president or owner of Contract Safety Consultants, Preferred Employees, and Total Safety Services, Inc.

# METHODOLOGY – ROOT CAUSE ANALYSIS

The evaluation tool I use to investigate and analyze an accident is based on widely recognized and accepted accident investigation analysis principles and methods employed in the safety profession: the **ROOT CAUSE ANALYSIS (RCA)**.

My **ROOT CAUSE ANALYSIS (EVENTS AND CAUSAL FACTOR ANALYSIS)** is used to investigate this accident and my report is a structured step by step technique and procedure for ascertaining and analyzing the causes of accidents. The PROBLEMS AND DEFICIENCIES listed below in my report are examples of the major accident catagories that should have been included when the crew completes a **(JSA)** and would be included in a ROOT CAUSE ANALYSIS investigation:

**<u>EXEMPLARY MAJOR ACCIDENT CATEGORIES</u>**
**EQUIPMENT / MATERIAL PROBLEMS,**
**PROCEDURE PROBLEMS,**
**DESIGN PROBLEMS,**
**TRAINING DEFICIENCIES,**
**MANAGEMENT PROBLEMS.**

Examples of the accident subcatagories listed in my report address the specific accident PROBLEMS AND DEFICIENCIES related to the accident:

**<u>EXEMPLARY SUBCATEGORIES</u>**

**DEFECTIVE TOOLS / EQUIPMENT,
PRE-EMPLOYMENT EMPLOYEE EVALUATION,
PRE-JOB / EMPLOYEE EVALUATION (JSA),
PERSONAL PROTECTIVE EQUIPMENT,
TRAINING / CERTIFICATION / LICENCES,
FEDERAL AND /OR STATE STANDARDS / INDUSTRY STANDARDS,
INDUSTRY SAFETY MANUALS AND PUBLICATIONS.**

# ROOT CAUSE ANALYSIS

## I DATA COLLECTION

The following documents were reviewed in preparation for this preliminary root cause analysis report:

**Deposition Testimony:**

- Mr. Jeremy Parker
- Mr. Travis Davis
- Captain Wayne Bishop
- Captain Anthony Burros

**Miscellaneous documents:**

- JOHN W. STONE OIL DISTRIBUTOR, LLC'S JOB DESCRIPTION RE TUG BOAT CAPTAIN
- JOHN W. STONE OIL DISTRIBUTOR, LLC'S JOB DESCRIPTION RE TANKERMAN
- USCG UNINSPECTED TOWING VESSEL EXAMINATION
- PHOTOGRAPHS
- ***M/V PRESAGER* –** VESSEL LOGS
- OCIMF – REVISED SHIP INSPECTION
- JOHN W. STONE OIL DISTRIBUTOR, LLC - VESSEL MANUAL
- JOHN W. STONE OIL DISTRIBUTOR, LLC – SAFETY POLICY MANUAL
- JOHN W. STONE OIL DISTRIBUTOR, LLC – SAFETY MANUAL POLICIES & PROCEDURES
- JOHN W. STONE OIL DISTRIBUTOR, LLC – REPORT OF INJURY
- KDON MARINE CONSULTING – EXPERT WITNESS REPORT
- TYPEWRITTEN STATEMENT OF CAPTAIN WAYNE BISHOP
- TYPEWRITTEN STATEMENT OF CAPTAIN ANTHONY BURROS

# II ACCIDENT DESCRIPTION

Mr. Jeremy Parker was employed as a Tankerman by John W. Stone Oil Distributor, LLC and assigned to work aboard the ***M/V PRESAGER,*** a Towing Vessel that, at the time of Mr. Parker's alleged accident, was facing up to two barges, S- 25 and the S-31. Captain Wayne Bishop was the Master of the vessel and at the wheel of the vessel. Captain Anthony Burros was sitting in a chair next to Captain Bishop. Mr. Travis Davis, another Tankerman was positioned on the S-25 pulling up on a facing wire. Mr. Parker was positioned on the outside of the port pushknee assisting Mr. Davis pull up on the facing wire at the time of his alleged accident. Mr. Parker sustained his alleged injury when the rope, holding the shackle, parted and allegedly fell and struck Mr. Parker who was standing underneath the load.

# III ASSESSMENT / OPINIONS

***I am using the above ROOT CAUSE categories to analyze this accident from a Safety Professional's standpoint.***

***The discovery documents, deposition testimony, and other information that I considered in forming these opinions and conclusions are attached as Appendixes in this report.***

# OPINION NO. 1

## WORK POSITIONING PROBLEM

**MR. JEREMY PARKER'S UNSAFE POSITIONING UNDER A LOAD WHILE IT IS BEING HOISTED.** It is my opinion based on my education, training and experience that Mr. Jeremy Parker sustained his alleged accident due to his unsafe position under the load of the facing wire, shackle and rope while Mr. Davis was pulling up on the facing wire. If Mr. Parker had not been under the load, the rope would have parted, as they all do eventually, and the shackel would have harmlessly fell to the deck. The shackel would have been picked up, the rope cut, and respliced onto the shackel.

The first rule taught to any person working around equipment is to never position oneself under a suspended load, regardless if the load is suspended by a rope or wire, or whether it is inspected yearly, monthly, daily, hourly or never. Mr. Jeremy Parker violated that rule.

The first rule taught to seamen is never get in the line of fire of a rope or wire under tension. Mr. Jeremy Parker violated that rule.

Concerning Mr. Green's expert assertion that the rope was not inspected prior to its use by anyone: This opinion would also have to apply to Mr. Parker. Mr. Parker could have inspected the rope prior to its use, particularly considering his intention to stand under the load while Mr. Davis pulled the facing wire onto the barge. There is no evidence to contradict that even if this rope had been inspected and found to be fit, the rope could have parted and dropped the shackle. A worker's safety cannot be based totally on inspections. A worker cannot place himself in a dangerous position under a load.

Mr. Green did not allege that failure to inspect this rope was a violation of industry standards or other governmental standards. In fact, John W. Stone Oil Distributor, LLC did not violate any American Waterways Guidelines, or OSHA and Coast Guard regulations as it pertains to Mr. Parker's alleged accident. Mr. Parker violated Stone's safety policies as shown below by standing under a load and by standing in the way of a rope under strain.

**JOHN W. STONE OIL DISTRIBUTOR, LLC**
**SAFETY MANUAL**
**POLICIES & PROCEDURES**

**CRANE AND RIGGING SAFETY POLICY**
**3.0 GENERAL REQUIREMENTS**

7. No one should stand under a suspended load or should the operator pass a load over personnel.

**JOHN W. STONE OIL DISTRIBUTOR, LLC**
**SAFETY POLICY MANUAL**

**GENERAL SAFETY RULES**

15. Stand clear of lines or wires when they have a strain on them.

**FEE SCHEDULE:**

Hourly charges are from portal to portal.
All expenses reimbursed by the client.
$1920.00 for deposition and trial testimony (minimum 3 hour charge, includes preparation time)
$320.00 per hour for all other services provided (fees are subject to annual increases).
$ 0.86 per mile for travel

The opinions found in this report are professional safety opinions relating only to this accident. While the expert opinions concern factual circumstances, which may be found by the trier of fact to constitute fault, they are not intended to be legal conclusions, as this is a matter for the court to determine and the trier of fact to decide. These opinions are based solely upon my many years of experience in the field of safety as it relates to this particular accident and should not be compared to other opinions in other cases.

If further discovery, research, inspections and/or review should develop additional information that would alter my opinion, the conclusions reached herein would be subject to my revision and this report amended as necessary.

Sincerely Yours



Robert E. Borison
President
Total Safety Services, Inc.

## APPENDIX

## DEPOSITION TESTIMONY USED TO FORM MY OPINION

***This pagination may not follow the transcript of the official depositions.***

**MR. JEREMY PARKER TESTIFIED AS FOLLOWS:**

Page 133: Q.··Okay.··Did -- was -- how many people were 10··on the -- how many people were on the crew of the 11··-- of the PRESAGER?"

Page 133: A.··We had six."

Page 133: Q.··Okay.··So it would be one captain and two 23··tankermen? A.··Yes."

Page 134: Q.··Okay.··Who -- who was your other tankerman ·4··that worked the same hitch as you? ·A.··Travis.··Travis Davis."

Page 134, Line Drawing (Red)

Page 134: Q.··All right.··And who was the captain during 12··the shift that you and Travis worked? A.··Tony Barrow."

Page 135: · · At the time of the accident you were 15··working from 12:00 midnight to noon? A.··10:00 to 10:00."

Page 135: "And you were working from 10:00 p.m. until 20··10:00 a.m.? A.··Yes."

Page 136: Q.··Okay.··Where was the -- where was the ·6··vessel positioned along the Mississippi? ·A.··We was on the 6 Dock of the fleet, faced ·8··up."

Page 140: Q.··And so at some point after 10:00 p.m., ·9··when you came onto your shift, y'all did get a 10··call? A.··Yes. Q.··All right.··And you were being prepared to 13··go and pick up a load in the Chalmette area? A.··No.··We got a call to -- to bring two 15··barges down."

Page 140: A.··We was faced up on empty.··We unfaced. 25··The empty was the same height of the barge -- of"

Page 141: "·1··the boat; so it don't take two men to do that, to ·2··unface.··So I was on one side.··Travis on one ·3··side.··He unface his side.··I unface mine.··We put ·4··it on the boat.··We put the face walls on the ·5··boat.··We step on the boat, and we go downriver to ·6··like the 9 Dock, I think. ·· And as we going down, we -- the captain ·8··tell us, We're going to take these two barges. ·9··Instead of facing up on the stern where it would 10··have been level with the pushknees and we both 11··could have just grabbed the face walls and faced 12··up, we didn't.··We came in it downstream on the 13··rake hand.··The rake hand was up, and it take two 14··men to do that."

Page 152: "· Q.··Okay.··So you were -- you were faced up to ·5··two barges on the 6 Dock? ·A.··Yes. ·Q.··And you got the call that you needed to go ·8··to Chalmette with two barges; is that -- ·A.··Right."

Page 152: Q.··All right.··And the two barges that you 13··were going to take down to Chalmette were the 25 14··and the 31, and those were positioned at the 15··9th Dock? A.··Right."

Page 152, Line Drawing (Red)

Page 152: Q.··Okay.··And so you and -- you and Travis 18··had disconnected from the barge at the 6 Dock? A.··Yes. Q.··All right.··And then y'all moved over to 21··the 9th Dock to -- to -- to -- to collect the 22··25 and -- A.··Face up and -- Q.··-- the 31? To face up and --"

Page 153: "· A.··On the stern."

Page 160: A.··So you got to do it twice.··So he hand the 24··-- he -- he -- he hand the line down.··When he 25··hand me the line -- it's a shackle on the end."

Page 161: "·1··And when he hand me the shackle, I lean -- I lean ·2··from here over because -- well, you can't really ·3··see it.··I -- I lean in and hook the face wall. ·4··He pull it up.··He pulled the double one up first, ·5··the two-part face wall.··He laid that on there. ·6··Now he got to walk -- walk back over and hand it ·7··back down.··When he hand it back down again, ·8··that's -- it's a one-part cable.··And he -- he ·9··hand it down.··I hook it.··And he pull it up, and 10··he sat it over here.··And then we walked to this 11··side -- Q.··Okay. A.··-- and we do the same thing for this side. And once he handed it down for the double, 15··the boat doing all this rocking.··And once he 16··handed it down to me, I hooked it, stepped back. 17··Because you -- because if not, I'd still be bent"

Page 161: "18··all over.··And I'm kind of like -- like right 19··here, back here now.··And when he pulled it up, 20··the line -- once he got almost to the top, the 21··line popped and the cable -- the cable came down 22··and the shackle hit me."

Page 161: So y'all had gone through this procedure"

Page 162: "·1··one time to already hook up to one of the -- ·A.··We did the starboard side."

Page 162: Q.··Right.··So you did the starboard side. ·· And so now you're doing it for the second ·5··time, and it was -- and you're following -- ·A.··Third time. ·Q.··Okay.··Third time.··Right. ·· Because you have to do it twice on each -- ·9··on each -- A.··Yeah. Q.··-- side? And so the first time you're doing it -- A.··On the port."

Page 162: Q.··On the port is when the line popped? A.··Yes."

Page 164: Q.··Okay.··All right.··So you're faced up to ·5··the bow when this is going on? ·A.··That's raked up."

Page 168: · · Now what is the rule about wearing a hard 20··hat during -- during an operation like this? A.··Well, we don't have any rules.··We don't 22··wear hard hats with that."

Page 175: Q.··Okay.··All right.··And you told me that 14··Travis was on either the 25 or the 31. From his position at the time that the 16··rope snapped, do you think he actually could see 17··you? A.··Yeah.··He can see me."

Page 175, Line Drawing (Red)

Page 178: Q.··-- of your head?··Okay. ·· And were you -- do you contend that you ·6··were struck with any part of the line when it -- ·7··when it snapped? ·A.··No.··Just the shackle --"

Page 178: Q.··Just the shackle that fell? Did you have any indication that the line 15··was -- there was any problem with the line before 16··this happened? A.··Nuh-uh."

Page 180: "Q.··Who has the responsibility to occasionally·3··check the condition of the line? ·A.··The captain make a boat inspection. ·5··They . . . ·Q.··And as the -- as the tankermen, would the ·7··actual inspection of the line fall upon you and ·8··Travis? ·A.··Nuh-uh.··Nuh-uh. "

Page 180: Q.··So it's your testimony that the captain 11··would actually go check the condition of the line? A.··Yeah.··He do the barge inspection.··Yes."

Page 184: Q.··Right.··Okay.··Again, we're dealing with ·8··an isolated problem of a rope snapping?"

Page 184: Yeah.··The -- the -- the rope snapped, and the cable came down -- the cable and the shackle came down.··Yes."

Page 185: Q.··All right.··There was nothing wrong with ·6··the lighting in that area where someone couldn't ·7··have seen what they needed to see? ·A.··Nuh-uh.··He had face -- we had the big ·9··lights on."

**CAPTAIN WAYNE BISHOP TESTIFIED AS FOLLOWS:**

Page 8: "What vessel are you currently assigned to? Q. Presager. A,"

Page 16: "downstreaming? is What Okay. Q. and when you taking a current When you -- A. you're going the flow with the current and you the current's the current and against backing up hitting you on your stern and going down."

Page 18: "Travis Davis my understanding that It's Q. with the line that of the barges standing on one was a shackle and he would hand that down to Jeremy, had face wire of the boat, then hook it to the who would on the pull up and set it would then Travis and work? this would how button; is that Correct. A."

Page 18: "was on duty at the Captain Burros Okay. Q. he? incident, wasn't time of this A. Yes."

Page 18: "But you were the one who actually Okay. Q."

Page 19: "faced up to the two empty rake barges, right?"

Page 19: "I -- when he started Like I would -- A. went up there and maneuvered the boat I maneuvering, once we got to the 25 and 31."

Page 20: "The face wires are located where? Okay. Q. You got three On the side the push leads. A. And they're about hooks on the side the push leads. a foot and maybe foot-and-a-half, give or take, spread apart, three different hooks; that way, you can hang the face wires as needed."

Page 23: "You -- you all were downstreaming, Okay. Q. though, when you were facing up to these barges, right? A. Yes."

Page 26: "On this particular day, could you Okay. Q. all have faced up on the stern end of those barges? We -- yes, we could have° A. And why didn't you? Q. Because the job called for the pipeline to A. be up."

Page 26: "And when you say "the job called Okay. Q. for," you're saying that the customer -- which I think was PBF? PBF, correct. A. asked for you guys to deliver the Q. -- barges pipeline up? Yes. A."

Page 27: "did you observe when you saw the line What Q. incident? after the The shackle was was popped. line The A."

Page 28: "the line -- the boat and deck of on the laying when I went out me the line Travis hand actually, check on it. to check it, there"

Page 28: "any Did you think the line had that Okay. Q. was deteriorated to the point where tear or wear and should have been taken out of service? it Yes. A."

Page 32: "think was did not that there .And you Q. end in facing up to the rake unsafe about anything position? particular this No. A. why is that? .And Q. If the There's nothing unsafe about it. A. You just .., it was -- job calls for it, you do it. the only difference is facing up on the was -- it the rake end you just going against the is box end current."

Page 33: "Would you also have expected a Okay. Q. lines on the Presager? the tankerman to inspect A. Yes."

Page 33: "been in fact, Mr. Parker have And would, Q. on the position to examine the lines in the best Presager? been in the best would have I think Travis A. he's the one inspect that line. Because position to to ... you know ... both line but that that grabbed them really should have inspected it, yes. I of and Jeremy. mean Travis"

Page 33: "the when -- when you had And All right. Q. line following the at the look opportunity to there was a readily apparent that it was incident, line? with the problem really tell if mean, you couldn't I No. A. tell if had a popped, you couldn't it after it it -- I mean, you would have to or not. in it spot bad ... popped. But before it look at it"

Page 34: "Q. What part of the -- what -- what part of the line did you observe had popped? it's kind of hard to explain. A. It's -- The line slips through an eye of the shackle and it -- we call it splice. It splices back into the line where it won't come untied or undone. But it loops around the shackle and it sits in this little hole. And I mean, in order to inspect that, you'll have to move the line around to ..."

Page 34: "Right. And that -- that°s my point: Q. Is that that wouldn't be readily apparent if you if you just looked at the shackle and the just -- line, correct? Correct. A."

Page 34: "You would have had to move the line Q. around? A. Right."

Page 34: "Could you just explain that a little bit Q. for us? Once the line is through the -- A. Yeah. the shackle, you can't see part through the hole of have to wiggle it around and You'll of the line, move it to inspect the whole line."

Page 35: "indicated that you would expect the You Q. the lines. Would that be tankermen to inspect the captain's responsibility of after before or the lines? inspecting necessarily the captain to It ain't A. tankerman is The the one out the lines. inspect barges. there on the"

Page 38: "Why do you think the line popped? Q, Okay."

Page 38: "various reasons. A. It could be It could been the wear and been the -- it could have have it could have been tear of the line; the -- the just -- it's vary dry rotted. It's round was say 100 But I can't percent that -- what reasons. was. the cause"

**MR. TRAVIS DAVIS TESTIFIED AS FOLLOWS:**

Page 7: "You are Q. Okay. currently employed be Stone Oil? ma'am. A. Yes, your position Q. And job is tankerman?"

Page 12: "I, Davis, on morning Travis the of February 9th around about 1:00 -- or 1:00 somewhere our about that time, boat was called on around to go job to PBF. We -- we was facing up on the barge a S-21 ... I'm guessing that's the and 5-25."

Page 12: "I was on the"

Page 12: "barge with a shackle top of the"

Page 13: "it -- a shackle and a line because the barge ..."

Page 13: ""because the head of the"

Page 13: "barge?""

Page 13: "A. Because the head of the barge ... of head higher than the the barge sits boat. Jeremy was at the bottom of the boat. I could barely see it. Jeremy the bottom of was at the boat, hooking the shackle on the -- on the face wire. We put -- we of the ... on, then Captain Tony put one side moved the boat over so we could put the face-- put the wire on the other side ... of face the barge with on popped. the shackle it The shackle -- the on popped and -- shackle it"

Page 13: "back I Q. Well, let's up. think it says, with the shackle on "then the line it popped"? ... other side on A. Let me see put the -- yeah, then with the then the line -- the line Sorry. shackle on it popped."
Page 13: "fell down A. And the shackle and hit Jeremy Captain head. Wayne asked Jeremy was he upside his will Then he Jeremy said he -- he be okay. okay and"
Page 14: "on got -- he got the barge to help me turn the barge loose and he started stumbling. I stopped him and him was he okay. asked"
Page 15: "Okay. All right. So you guys were facing "
Page 15: "It's my understanding that those up to two barges. barges; is recall? were two empty rake that what you ma'am. A. Yes, were on the top of of the Okay. You one Q. line was, I with the shackle and and Jeremy barges going going take -- you were to hand that guess, to going to Jeremy and he was to take that and down on or -- to the face wire the barge hook the shackle On the boat. A. sorry. On the boat? I'm the boat? on -- 4• ma'am. A. Yes,"
Page 16: "So you're sitting -- I'm on the very A. top. and line down so hand the shackle the I have to Jeremy can hook the face wires and I pull it it to on the button. and set it up"
Page 16: "you-all get So you -- one barge Okay. Q. then gets moved so you can do and the boat connected barge; is that what happened? other the over, ma'am. it yes, A. Slide when you guys working to get So are Okay. Q. when the connected is line popped? the second barge ma'am. A. Yes,"
Page 16: "And you guys were in the same Okay. Q. with the shackle and position you were on the barge he -- line, Jeremy's down on the boat, and the with and you're gonna give him the line the shackle face wire? that to the connect he's gonna ma'am. Yes, A."
Page 16: "in that process did what point Okay. At Q. him? fall and hit the shackle and the line pop we slid the like I said, When we -- A. side up. And hook the other to over boat boat -- one face wire hooked on, I -- we when he hooked it"
Page 17: "three part line. We put one on and on -- it's a other to hook the one on. When I getting ready when up to the top, that's it popped. pulled it"
Page 17: "Why think Okay. do you the line Okay. Q. popped? old. A. It's"
Page 20: "for y'all So these two barges that Okay. Q. if had been working with the that day, you picked up barges would you still have had to of these box end with shackle? line the use the ma'am. A. Yes,"
Page 24: "You-all -- and I mean the by that, Okay. Q. wear when typically hardhats tankermen -- don't connecting these barges, do you? you're ma'am. A. No, Do you know what happened to the Okay. Q. incident? after this that popped line ma'am. A. No,"